IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 8, 2025

**ROBERT JASON BURDICK v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1350    Angelita Blackshear Dalton, Judge**

_____

**No. M2024-00353-CCA-R3-PC**

_____

The Petitioner, Robert Jason Burdick, appeals the Davidson County Criminal Court's order denying his three post-conviction petitions, seeking relief from his convictions of one count of especially aggravated kidnapping, three counts of aggravated rape, one count of attempted aggravated rape, and one count of aggravated burglary and his effective sentence of forty-six years in confinement. On appeal, the Petitioner claims that he received the ineffective assistance of trial and appellate counsel, that the cumulative effect of counsel's deficient performance warrants new trials and sentencing hearings, and that the consecutive sentencing statute is void for vagueness. Based on our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Robert Jason Burdick (on appeal), Pro Se, Hartsville, Tennessee, and Manual B. Russ (at hearing and amended petitions), Kathleen G. Morris (amended petitions), and Jacob A. Wilson (amended petitions), Nashville, Tennessee, for the appellant, Robert Jason Burdick.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case relates to a series of rapes committed by the Petitioner in the Nashville area. *See State v. Burdick*, No. M2010-01726-CCA-R3-CD, 2012 WL 2160243 (Tenn.

Crim. App. June 13, 2012); *State v. Burdick*, No. M2009-02085-CCA-R3-CD, 2012 WL 1366359 (Tenn. Crim. App. Apr. 18, 2012), *perm. app. denied* (Tenn. Oct. 18, 2012); *State v. Burdick*, No. M2010-00144-CCA-R3-CD, 2011 WL 6020569 (Tenn. Crim. App. Dec. 2, 2011), *aff'd* 395 S.W.3d 120 (Tenn. 2012).[1] Beginning in March 1994 and continuing for more than twelve years, an unidentified man dubbed the "Wooded Rapist" sexually assaulted women, including a sixteen-year-old high school student, in Davidson and Williamson Counties. *See State v. Burdick*, No. M2011-01299-CCA-R3-CD, 2012 WL 2151489 (Tenn. Crim. App. June 13, 2012), *perm. app. denied* (Tenn. Sept. 18, 2012).

In April 2008, the police developed the Petitioner as a suspect. On April 28, officers began visually surveilling him and followed him to a restaurant in La Vergne. After the Petitioner left the restaurant, the officers collected his eating utensils and submitted them to the Tennessee Bureau of Investigation ("TBI") for DNA analysis. The next day, officers placed a GPS tracking device on the Petitioner's Jeep and continued their visual surveillance of his whereabouts. On May 1, 2008, Detective David Elliott of the Metropolitan Nashville Police Department ("MNPD") submitted an affidavit in support of a search warrant for the Petitioner's person, home, and vehicles. This court previously summarized the factual information in the affidavit as follows:

> Eleven "rapes and/or personal attacks" occurred between March 1994 and December 2006, in homes in the Forest Hills area [of Davidson/Williamson Counties], by an individual known as the "Wooded Rapist," due to similarities in the crimes. The attacker was a white male of average build in his 20s or 30s, wore dark clothes and gloves, and covered his face. The perpetrator had a gun, knife, or "other cutting instrument." The victims were bound and blindfolded, and some were taken to another part of the property. DNA evidence was recovered from eight of the attacks. DNA analysis showed that all of these attacks were perpetrated by the same person. The perpetrator made statements to the victims that indicated he had been watching the victims or their homes. In 2005, the victim of a burglary and attempted rape [helped] the Tennessee Bureau of Investigation (TBI) develop a sketch of the perpetrator. The sketch was similar to the [Petitioner's] driver's license photograph. Around 1:00 or 1:30 a.m. on November 4, 2004, a neighbor saw one of the victims outside with another person during one of the rapes. The perpetrator of the rape took the victim outside [her home on Williamsburg Road] during the assault. The following day, a witness reported having seen a man at about 7:00 p.m. the previous day. The witness

---

[1] The State has requested that we take judicial notice of these records from the direct appeals of the Petitioner's convictions. In order to determine the procedural history and facts of this case, we choose to take judicial notice of the records. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009).

described a white male, dressed in black, wearing a black stocking cap, and standing behind a tree near a business that was behind the victim's home. About two blocks away, on April 28, 2008, a witness who was visiting a family member on the same . . . street where the November 4, 2004 rape took place was sleeping in a camper when she was awakened by a growling dog. She looked outside and saw a man in dark clothing and a ski mask standing between two cars on the property and looking inside the cars with a flashlight. She yelled at the person, who said something unintelligible and walked toward Williamsburg Road. The witness notified the police. A police officer found a Jeep, which was registered to the [Petitioner], parked on a street within walking distance. The Jeep's hood was warm. He saw a red hat, a black bag, and beverage containers in the Jeep. The officer remained in the area and, around 1:31 a.m., he saw the Jeep leaving the area [on Meadowlake Road]. He stopped the Jeep, which was driven by the [Petitioner]. The [Petitioner] was wearing camouflage pants, a gray t-shirt with cut-off sleeves, tennis shoes, and the red hat the officer had seen earlier in the Jeep. The [Petitioner] was approximately 5′11″, weighed about 200 pounds, and had a muscular build, brown hair, and blue eyes. The [Petitioner] told the officer that he had been visiting a friend named Ricky Douglas at a house located near the place the officer saw the Jeep earlier. The [Petitioner] said he parked on the street because there were several other cars in the driveway. The [Petitioner] refused to consent to a search of the Jeep. Officers went to the home the [Petitioner] identified as his friend's and spoke with one of its residents. She denied knowing the [Petitioner] or that there had been a gathering at the house earlier, although she identified six other people who were staying overnight at the house. Police officers conducted hundreds of hours of nighttime surveillance of the area in 2006 and 2007 and never saw anyone on foot in the neighborhood. The [Petitioner's] physical appearance matched that given by the victims and a sketch prepared by the TBI. The affiant believed there was probable cause to believe the [Petitioner] was the person on foot in November 2004 and the perpetrator of the attacks. The affidavit identified the [Petitioner's] home by address, appearance, and photograph and requested permission to search the home and its occupants, as well as outbuildings and cars on the premises.

*Burdick*, 2012 WL 1366359, at *7.

Based on the information in the affidavit, a general sessions judge issued a search warrant on May 1, 2008. The police executed the warrant that same day. During the search of the Petitioner's home, they found a roll of duct tape, handguns, condoms inside a gun case, several items of dark clothing, ski masks, a toboggan, night-vision goggles, and anti-

dog-barking devices. They also found a roll of duct tape in the Petitioner's Jeep. The police arrested the Petitioner, collected buccal swabs from him pursuant to the search warrant, and submitted the swabs to the TBI for DNA analysis. The Petitioner's DNA profile matched the Wooded Rapist's DNA.

On May 9, 2008, the Davidson County Grand Jury returned a thirteen-count indictment, charging the Petitioner with seven counts of aggravated rape, two counts of attempted aggravated rape, one count of attempted rape, one count of especially aggravated kidnapping, and two counts of aggravated burglary.[2] The thirteen counts involved nine victims and eight separate incidents and were severed for trial by offense date. This appeal concerns three trials[3] and six counts: The April 2009 trial for count eleven, aggravated burglary, and counts twelve and thirteen, aggravated rape of B.S., on November 19, 2007; the October 2009 trial for count one, aggravated rape of P.Y., on March 1, 1994; and the March 2010 trial for count six, especially aggravated kidnapping of D.A., and count seven, aggravated rape of J.G, on February 18, 2000.[4]

On September 19, 2008, the Petitioner filed a motion to suppress evidence at his trial for counts eleven through thirteen involving B.S. In the motion, the Defendant claimed that evidence obtained from the searches of his person, home, and vehicles was inadmissible because Detective Elliott's search warrant affidavit failed to establish probable cause that he was the "Wooded Rapist" or that he committed the only offense alleged in the affidavit, which was the 2004 rape on Williamsburg Road. In support of his claim, the Petitioner asserted that (1) the mere fact that a suspicious man was seen in the neighborhood of Williamsburg Road in the early morning hours of April 28, 2008, did not establish probable cause that the same man committed the 2004 rape or the Forest Hills rapes from 1994 to 2006; (2) the description of the suspicious man seen on April 28, 2008, did not match the description of the "Wooded Rapist"; (3) the Petitioner, when stopped by the police officer in the early morning hours of April 28, 2008, did not match the description of the suspicious man; (4) the fact that the Petitioner lied to the officer did not establish probable cause that he was the "Wooded Rapist"; and (5) the Petitioner did not match the description of the "Wooded Rapist" or the 2005 sketch of the suspect. The Petitioner noted that his driver's license photograph and the sketch were not attached to the search warrant affidavit so that the general sessions judge could compare them.

On November 20, 2008, the Petitioner filed a second motion to suppress evidence, claiming that his traffic stop in the early morning hours of April 28, 2008, was illegal

___

[2] The Williamson County Grand Jury also returned a multi-count indictment against the Petitioner. *See Burdick v. State*, No. M2020-00141-CCA-R3-PC, 2021 WL 2499313, at *1 (Tenn. Crim. App. June 18, 2021), *no perm. app. filed*.

[3] The case number for all three trials was the same, 2008-B-1350.

[4] It is the policy of this court to refer to victims of sexual assault by their initials.

- 4 -

because nothing indicated he was the suspicious man seen earlier in the area and because none of the items the officer saw in his parked Jeep suggested that he had committed or was about to commit a crime. The Petitioner asserted that the illegal seizure, during which he was evasive and lied to the police, caused the police to investigate him further, which ultimately led to his arrest for the crimes. The trial court held suppression hearings and denied both motions.

In April 2009, the Petitioner proceeded to trial for counts eleven through thirteen involving the rape of B.S. The proof at trial showed that on the night of November 18, 2007, B.S., who was a widow and lived alone, fell asleep in her den while watching television. *Burdick*, 2012 WL 1366359, at \*1. She was awakened by a man telling her to get up. *Id*. He was wearing a stocking cap with the eyes, nose, and mouth cut out. *Id*. He put duct tape over her eyes and around her wrists, French-kissed her mouth, and kissed her breasts. *Id*. He penetrated her rectum with his finger and her vagina with his penis. *Id*. When he was finished, he cut the tape off her wrists, put her into the shower, turned on the water, removed the tape from her eyes, and left her home. *Id*. B.S. did not stand under the water and got out of the shower when she thought the man had left. *Id*. Nurse Merrill Stopplebein, who performed B.S.'s sexual assault examination, testified that B.S. had red marks on her wrists. *Id*. at \*2. TBI Special Agent Chad Johnson, an expert in DNA analysis, testified that male DNA on B.S.'s anal, tongue, and breast swabs matched the Petitioner's DNA, and the jury convicted the Petitioner as charged in the indictment of aggravated burglary and two counts of aggravated rape causing bodily injury. *Id*. at \*3. After a sentencing hearing, the trial court found that he was a dangerous offender and ordered consecutive sixteen-year sentences for the aggravated rapes and a concurrent three-year sentence for aggravated burglary for a total effective sentence of thirty-two years in confinement. *Id*.

On direct appeal of his convictions, the Petitioner claimed that the proof was insufficient to show bodily injury, that the trial court erred by denying his two pretrial motions to suppress evidence, and that the trial court erred by imposing consecutive sentencing. *Id*. at \*1. This court found that the evidence was sufficient, that Detective Elliott's affidavit established probable cause for the search warrant, and that the patrol officer had reasonable suspicion to conduct the brief investigative stop of the Petitioner on the morning of April 28, 2008. *Id*. at \*8, 10. Accordingly, this court affirmed the convictions. *Id*. at \*12. However, this court remanded the case to the trial court for additional findings regarding imposition of consecutive sentencing based upon the dangerous offender classification as required by *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). *Id*. at \*11. On remand, the trial court ordered that the Petitioner serve the three sentences concurrently for a total effective sentence of sixteen years.

The proof at the Petitioner's October 2009 trial for count one, aggravated rape of P.Y., showed that in the early morning hours of March 1, 1994, P.Y was asleep when she was awakened by something touching her neck and shoulders. *Burdick*, 395 S.W.3d at 122. A male intruder, who was not wearing pants and had a stocking over his face, sprawled across her body and pinned her down onto her stomach. *Id*. They struggled, and he struck her head repeatedly. *Id*. P.Y. bit the intruder multiple times and even bit off a piece of skin from his finger. *Id*. He pressed his hand toward her vaginal area but eventually stopped fighting her, forced her into the bathroom, and fled. *Id*. A DNA profile was developed from the piece of skin, but the profile did not match anyone in the Combined DNA Index System ("CODIS") at that time. *Id*. In early 2000, almost six years after the attack, an affidavit of complaint was filed in general sessions court against "John Doe" for aggravated rape. *Id*. at 123. John Doe's DNA profile was attached to the affidavit, and an arrest warrant was issued for John Doe. *Id*. In 2006, more than twelve years after the attack, the grand jury returned a multi-count indictment, charging John Doe with aggravated burglary and aggravated rape of P.Y. along with the offenses related to D.A. and J.G. *Id*. The DNA profile and fingerprints in P.Y.'s case were found to match the Petitioner's DNA in 2008, and a superseding indictment was returned against the Petitioner in 2012. *Id*. The jury convicted the Petitioner of attempted aggravated rape as a lesser-included offense of aggravated rape, and the trial court sentenced him to ten years to be served consecutively to his previous effective sixteen-year sentence for counts eleven, twelve, and thirteen involving B.S. *Id*. at 123-24.

On direct appeal of his conviction, the Petitioner claimed that filing the "John Doe" warrant was insufficient to commence prosecution within the eight-year statute of limitations for the convicted offense of attempted aggravated rape. *Id*. at 124. Our supreme court concluded that "[a] criminal prosecution is commenced if, within the statute of limitations for a particular offense, a warrant is issued identifying the defendant by gender and his or her unique DNA profile. Furthermore, a superseding indictment in the defendant's proper name provides the requisite notice of the charge." *Id*. at 130. Accordingly, the supreme court affirmed the Petitioner's judgment of conviction. *Id*.

The proof at the Petitioner's March 2010 trial for count six, especially aggravated kidnapping of D.A., and count seven, aggravated rape of J.G., showed that on the evening of February 17, 2000, D.A. was visiting J.G., who had three young children, at J.G.'s home in Nashville. *Burdick*, 2012 WL 2160243, at *1. After everyone went to bed, D.A. was awakened in her room by a man wearing a mask and dark clothing. *Id*. He pulled out a gun and forced her to go to J.G.'s bedroom. *Id*. D.A. tapped on J.G.'s door, which was locked, and asked her to open the door. *Id*. When J.G. did so, the man ordered both women onto the floor, tied each of their hands together with plastic ties, and put duct tape over their eyes. *Id*. J.G. heard one of her children's footsteps in the hallway, so the man told D.A. to go comfort the children and walked D.A., with her hands still bound and her eyes

- 6 -

still covered, to the children's bedroom door. *Id.* While D.A. was singing and praying with the children, the man had sexual intercourse with J.G, put her into the shower, turned on the water, and left. *Id.* The State's DNA expert testified that in May 2008, it was discovered that male DNA on J.G.'s vaginal swab matched the Petitioner's DNA. *Id.* at *3. An expert in DNA analysis testified for the Petitioner that false positives could occur, that replication of DNA testing helped eliminate those errors, and that the DNA profile from the vaginal swab was incomplete because it contained only twelve of thirteen loci. *Id.* The jury convicted the Petitioner as charged in the indictment, and the trial court sentenced him to concurrent twenty-year sentences to be served consecutively to the prior sentences in the cases involving B.S. and P.Y. for a total effective sentence of forty-six years.

On direct appeal of his convictions, the Petitioner claimed that the evidence was insufficient because the only proof against him was the DNA evidence. *Id.* at *3. He also claimed that the trial court erred by sua sponte limiting his cross-examination of the State's DNA expert and by not allowing him to make an offer of proof concerning the expert's excluded testimony. *Id.* at *5. This court determined that the evidence was sufficient and that the Petitioner was not denied his right to confront the expert because the trial court had ruled previously that the excluded testimony was inadmissible and because trial counsel did not request to make an offer of proof. *Id.* at *5, 7.

The Petitioner filed three timely petitions for post-conviction relief, one for each trial, alleging numerous grounds of ineffective assistance of trial and appellate counsel. The post-conviction court appointed counsel, and post-conviction counsel filed several amended petitions, alleging additional grounds of ineffective assistance of counsel. Relevant to this appeal, the Petitioner alleged that (1) trial and appellate counsel failed to challenge the warrantless installment of the GPS tracking device on his Jeep and failed to seek suppression of the DNA obtained from his buccal swabs (all counts); (2) trial counsel failed to file a motion to suppress evidence obtained from his alleged unlawful arrest on May 1, 2008, and failed to prepare an adequate motion to suppress evidence seized pursuant to the search warrant (all counts); (3) trial counsel failed to investigate the statements in the search warrant affidavit (all counts); (4) trial counsel failed to keep a promise made to the jury during opening statements (counts eleven through thirteen involving B.S.); (5) trial counsel failed to object to improper comments made during the State's closing arguments (counts eleven through thirteen involving B.S.); (6) trial counsel failed to object to a nurse practitioner's hearsay testimony and a police officer's statement that the Petitioner was "our serial rapist" (counts six and seven involving D.A. and J.G.); (7) trial counsel failed to challenge the trial court's imposition of a sentence above the eight-year minimum for attempted aggravated rape (count one involving P.Y.); (8) trial and appellate counsel failed to argue that the trial court should apply a statutorily mandated mitigation factor for his especially aggravated kidnapping conviction and failed to

challenge the length of the sentences imposed (counts six and seven involving D.A. and J.G.); and (9) counsel failed to challenge Tennessee Code Annotated section 40-35-115(b)(4), which allows consecutive sentencing for a dangerous offender, as void for vagueness on direct appeal (count one involving P.Y. and counts six and seven involving D.A. and J.G.). The Petitioner also claimed that he was entitled to relief based on the cumulative effect of counsel's errors and raised a stand-alone constitutional claim regarding Tennessee Code Annotated section 40-35-115(b)(4).

On January 28, 2018, the post-conviction court entered an order, stating that it would set an evidentiary hearing to address all of the petitions. The court held a bifurcated evidentiary hearing on May 30 and August 11, 2023.

At the May 2023 hearing, the parties stipulated to Captain David O'Neil's testimony from the Petitioner's November 26, 2019 post-conviction evidentiary hearing in Williamson County. The post-conviction court admitted a transcript of Captain O'Neil's testimony into evidence.

According to the transcript, Captain O'Neil testified that he became an officer with the Brentwood Police Department in 1996 and that he was licensed to practice law in 2008. The MNPD developed the Petitioner as a suspect on Sunday, April 27, 2008. On Monday, April 28, 2008, Captain O'Neil and his partner were part of the surveillance team that followed the Petitioner from his workplace to the restaurant in La Vergne and collected the Petitioner's eating utensils. They delivered the utensils to the TBI, and the DNA from the utensils matched the then-unknown Wooded Rapist's DNA. Captain O'Neil said he thought the MNPD used that DNA match as probable cause to obtain the Petitioner's buccal swabs after his arrest.[5] On April 29, 2008, the officers attached a GPS tracking device to the Petitioner's Jeep in a Kroger parking lot. Captain O'Neil said "the *Jones* decision" was still several years away; therefore, a warrant was not required to attach the GPS device to the vehicle.[6] He said that the Petitioner was the "strongest" suspect the police had ever developed in the Wooded Rapist case and that the officers placed the GPS device on his vehicle to protect the public from additional rapes if the police lost visual surveillance of him. The State asked if "any evidence about the GPS" was used at any of the Williamson County trials, and Captain O'Neil responded, "Not that I know of." The State then asked if the attachment of the GPS to the Defendant's Jeep led to his arrest, and Captain O'Neil said no.

---

[5] We note that Detective Elliott's search warrant affidavit did not mention the eating utensils or any DNA evidence linking the Petitioner to the series of rapes.

[6] Captain O'Neil was referring to *United States v. Jones*, 565 U.S. 400 (2012).

On cross-examination, Captain O'Neil denied installing the GPS device to obtain evidence against the Petitioner. He said, though, "If evidence had come about during the use of that device, we wouldn't have ignored it." He acknowledged that the Petitioner's criminal case was "in the pipeline" at the time of the *Jones* decision.

The Petitioner testified at the evidentiary hearing that he initially was represented by two attorneys from the public defender's office (hereinafter "first trial counsel" and "second trial counsel"). Later, his family retained two attorneys (hereinafter "third trial counsel" and "fourth trial counsel"), who replaced first and second trial counsel. At some point, third trial counsel's office merged with another attorney's office, and two additional attorneys joined the Petitioner's defense team. All four attorneys represented the Petitioner at his three trials, on direct appeal of his conviction for count one involving P.Y., and on direct appeal of his convictions for counts eleven through thirteen involving B.S. Another attorney (hereinafter "appellate counsel") represented the Petitioner on direct appeal of his convictions for counts six and seven involving D.A. and J.G.

The Petitioner testified that third trial counsel was the lead attorney and the attorney he talked with most often about his case. The police arrested the Petitioner on May 1, 2008, and he remained incarcerated pending his trials. Third trial counsel met with him only three or four times in jail and met with him in the courtroom immediately before each trial. First and second trial counsel had provided discovery materials to the Petitioner, and third trial counsel reviewed "some" of the materials with him. Third trial counsel did not discuss any defenses with the Petitioner because third trial counsel was more concerned about preparing for the trials.

The Petitioner testified that the only evidence against him was the DNA evidence. In the trial for counts eleven through thirteen involving B.S., the Petitioner expected a DNA expert to testify on his behalf. The defense had retained a DNA expert, and third trial counsel told the jury in his opening statement that the expert would testify. However, "for some reason [that] didn't happen." The Petitioner said that by not calling the expert to testify, the defense lost credibility with the jury. He said third trial counsel also failed to object to "flagrant and highly inappropriate remarks" made by the prosecutor during closing arguments. Specifically, the prosecutor referred to the Petitioner as "evil" and urged the jury to convict him to protect the community. He said the prosecutor also told the jury that "'any penetration constitutes aggravated rape'" and that the Petitioner's presumption of innocence ended after the trial court read the final jury charge. The Petitioner said both statements were incorrect because bodily injury also was required for aggravated rape and because the Petitioner's presumption of innocence did not end until the jury found him guilty. Additionally, the Petitioner said the prosecutor vouched for the DNA evidence by describing it as "'infallible'"; commented on the defense's failure to present a DNA expert when the defense was under no obligation to present any evidence;

offered the prosecutor's personal opinion of the State's evidence by saying if the Petitioner were acquitted, then he committed the "perfect crime"; and told the jury that the Petitioner was guilty of all the charges.

The Petitioner testified that before trial, he wrote letters to third trial counsel, asking about the "GPS issue." First trial counsel had prepared a motion to suppress evidence based on the GPS tracking device. The motion was "95 percent complete," but third trial counsel did not finish or file the motion. The Petitioner said that while his direct appeals were pending, the United States Supreme Court released *Jones*, which held that a warrant was required in order for law enforcement to place a GPS tracking device on a suspect's vehicle. The Petitioner said, and the record reflects, that trial and appellate counsel did not raise the GPS issue on appeal.

The Petitioner testified that third trial counsel should have challenged the May 1, 2008 search warrant because Detective Elliott made false statements in his affidavit. The Petitioner noted that he was stopped by the police officer on April 28, 2008, in an area that was five or six miles from Forest Hills and that he was not wearing dark clothing, which the Wooded Rapist was known to wear. The Petitioner asserted that, at most, he was a suspect in a car burglary, not a rape. Moreover, the Wooded Rapist was known to look into victims' homes, not cars. The Petitioner stated that the affidavit failed to establish a nexus between his home and the crimes and that the search warrant affidavit suggested it was raining before the stop. The Petitioner said that a printout of the weather "off of the internet" would have shown third trial counsel that it was not raining. The Petitioner identified a computer printout from a weather website, showing the weather at the Nashville Airport on April 26, 27, and 28, 2008. Post-conviction counsel introduced the printout into evidence.[7]

The Petitioner testified that during his trial for count one, aggravated rape of P.Y., he had evidence that third trial counsel did not present to the jury: The Petitioner knew P.Y. and went to her home to get money she owed him. The Petitioner said that he committed a burglary but that he was not naked and did not attempt to rape P.Y. The Petitioner wrote letters to third trial counsel, explaining why he went to P.Y.'s house, but third trial counsel did not investigate the incident or interview P.Y.

The Petitioner testified that during his trial for counts six and seven involving D.A. and J.G., Sandy Myers, a nurse practitioner, was allowed to testify about statements J.G. made to Ms. Myers during J.G.'s sexual assault examination. J.G.'s statements included D.A.'s claim that the intruder held a gun to D.A.'s head. The Petitioner said that third trial

---

[7] Per our interpretation of the printout, it rained lightly in the Nashville area on April 26, 27, and 28, including the early morning hours of April 28.

- 10 -

counsel should have objected to Ms. Myers's statements as hearsay and that third trial counsel should have moved for a mistrial when Detective Julie Lawson testified that the Petitioner "'fit the description of our serial rapist.'"

The Petitioner testified that third trial counsel rendered deficient performance at the sentencing hearing for count one involving P.Y. and the sentencing hearing for counts six and seven involving D.A. and J.G. At the conclusion of the sentencing hearing for count one, the trial court sentenced the Petitioner to ten years, the midpoint in the range, for attempted aggravated rape. The Petitioner said third trial counsel should have argued for an eight-year sentence because the Petitioner did not have any prior felony convictions; he was a Range I, standard offender; and no enhancement factors were applicable. The Petitioner said that at the sentencing hearing for counts six and seven involving D.A. and J.G., third trial counsel should have urged the trial court to mitigate the sentence for especially aggravated kidnapping because D.A. was voluntarily released alive. The Petitioner received a twenty-year sentence, the midpoint in the range, for each offense. He said trial and appellate counsel failed to raise either sentencing issue on direct appeal of the convictions. The Petitioner stated that he had "limited" interaction with appellate counsel and that he met with appellate counsel only one time.

On cross-examination, the Petitioner acknowledged that no direct evidence from the GPS device was introduced into evidence at his trials. He said first trial counsel met with him a couple of times and filed a motion to suppress evidence based on a lack of probable cause for the search warrant. Subsequently, the Petitioner's family hired third and fourth trial counsel. The Petitioner acknowledged that he never expressed to the trial court that he had concerns about counsel's representation. He said, though, that he "didn't know about the board of professional responsibility and stuff like that."

The Petitioner testified that third trial counsel retained a forensic scientist to testify as a DNA expert at his trial for counts eleven though thirteen involving B.S. The Petitioner denied knowing that the expert would have corroborated the DNA testimony given by the State's witnesses. He said a different DNA expert testified for the defense at his trial for counts six and seven involving D.A. and J.G.

On redirect-examination, the Petitioner testified that he did not see the first DNA expert's report but that he thought the report was favorable to his defense. The expert was present at the first trial but did not testify. The Petitioner did not think his defense team would have spent money on the expert's traveling to Nashville for trial if the information in the expert's report had been unfavorable. Regarding third trial counsel's failure to present the Petitioner's defense at his trial for count one, he was in P.Y.'s house to get money she owed him, the Petitioner acknowledged that he chose not to testify and, therefore, that third trial counsel was unable to get his story before the jury. The Petitioner

also acknowledged that the jury convicted him of attempted aggravated rape of P.Y. as a lesser-included offense of aggravated rape.

Third trial counsel testified that he previously practiced law in Tennessee and that a large portion of his practice involved criminal defense. About a year after the Petitioner's arrest, the Petitioner retained third and fourth trial counsel to replace first and second trial counsel. Third trial counsel was the lead attorney for the Petitioner's three Davidson County trials, and fourth trial counsel was responsible for filing and arguing motions and for filing appellate briefs. At some point, third trial counsel's office merged with another law office, and two additional attorneys joined the defense team.

Third trial counsel testified that he and fourth trial counsel had a "lengthy discussion" with first trial counsel at the public defender's office and obtained the Petitioner's file. Third trial counsel did not recall reviewing discovery materials with the Petitioner, but another member of the defense team may have done so. Third trial counsel said that he also did not recall discussing the GPS device with first trial counsel but that he was "sure" the defense team knew the *Jones* case was "in the pipeline." He said the ultimate decision about whether to file a motion to suppress based on the GPS device would have been made by fourth trial counsel because fourth trial counsel was responsible for filing motions. Third trial counsel focused on the trials and "being prepared to argue that case in its best light." Third trial counsel did not remember how many times he met with the Petitioner.

Third trial counsel testified that he decided not to call a DNA expert to testify at the Petitioner's trial for counts eleven through thirteen involving B.S. because the expert's testimony would have been detrimental to the Petitioner's case. Third trial counsel did not remember telling the Petitioner before trial that the expert was not going to testify, but third trial counsel "would have wanted [the Petitioner] to understand that this person was not going to testify and why." Third trial counsel said that he would not have prevented the Petitioner from reviewing the expert's report and that it was his "recollection" the expert was not present at trial. Third trial counsel did not specifically recall the prosecutor's misstating the law during closing arguments at the Petitioner's trial for counts eleven through thirteen involving B.S. Third trial counsel said that although the prosecutor was known to make statements he found objectionable, he usually did not object during opposing counsel's closing arguments. He explained that "getting up in closing argument and jumping up every other sentence and objecting to [the prosecutor] and getting shot down in front of the jury was not going to swing the pendulum in our direction[.]" However, he said he would have objected and asked for a sidebar to protect the record if the prosecutor had made an "exceedingly objectionable" comment. He also may have responded to the comment during his own closing argument. Third trial counsel said the

fact that he did not object meant he made a strategic decision so as not to harm the Petitioner's case.

Third trial counsel testified that the defense team found and retained a different DNA expert for the Petitioner's trial for counts six and seven involving D.A. and J.G. and that the expert was helpful to the Petitioner's defense. He said that during cross-examination of the State's DNA expert at the trial, fourth trial counsel tried to make an offer of proof when the trial court excluded some of the expert's testimony. However, the trial court refused to allow the proffer. Fourth trial counsel was adamant about making the offer of proof, so the trial court held fourth trial counsel in contempt and ordered that he be taken into custody. Third trial counsel said that "cooler heads prevailed post-lunch" and that he did not remember fourth trial counsel's actually being taken into custody. Third trial counsel thought fourth trial counsel's argument with the trial court was more than adequate to protect the record on direct appeal, but this court held otherwise.

Third trial counsel testified that he did not recall receiving a letter from the Petitioner about being in P.Y.'s home to get money she owed him. Regardless, third trial counsel would have disagreed with the Petitioner about presenting that defense to the jury. Third trial counsel also did not remember talking with the Petitioner about testifying at the trial, but the trial court would have held a *Momon* hearing. Third trial counsel said that a defendant's testifying was rarely beneficial and that he usually advised his clients not to testify. The defense strategy at the trial was to show that the Petitioner only attempted to rape P.Y. and then to challenge the statute of limitations for attempted aggravated rape on direct appeal. Third trial counsel discussed the strategy with the Petitioner, and the Petitioner did not object. Third trial counsel said the defense's strategy was partially successful: The jury convicted the Petitioner of attempted aggravated rape, but the Tennessee Supreme Court ultimately concluded that the conviction did not violate the statute of limitations.

On cross-examination, the State questioned third trial counsel about his decision not to call the DNA expert to testify at the Petitioner's trial for counts eleven through thirteen involving B.S. The State showed a report to third trial counsel, and he identified it as the expert's report. Third trial counsel said that the expert reviewed the State's DNA analysis and found minor irregularities in the DNA testing but that the expert concluded the DNA at the crime scene was the Petitioner's DNA. Third trial counsel stated that the prosecutor had interviewed the expert and that the prosecutor "would have had a field day" with the expert on the stand. Third trial counsel said he, therefore, decided that the expert would not testify.

Third trial counsel testified that at the Petitioner's trial for counts six and seven involving D.A. and J.G., a different DNA expert testified for the defense that the State's

DNA analysis was not sufficient to establish a match with the Petitioner's DNA. Third trial counsel said that fourth trial counsel cross-examined the State's DNA expert but that the trial court limited the cross-examination. Third trial counsel said that on direct appeal, which was handled by appellate counsel, appellate counsel asserted that the trial court erred by limiting the cross-examination testimony and by not allowing fourth trial counsel to make an offer of proof.

Third trial counsel testified that he represented the Petitioner to the best of his ability and that he used his best legal judgment in all three trials. The Petitioner never voiced any concerns about third trial counsel's representation.

Fourth trial counsel testified for the State that he practiced law, mostly criminal defense, in Davidson County from 1987 to 2017. His practice focused on appellate work, and he estimated that he participated in "scores" of trials and hundreds of appeals. Fourth trial counsel assisted third trial counsel with all three of the Petitioner's trials and was responsible for the direct appeals of the Petitioner's conviction in count one involving P.Y. and his convictions in counts eleven through thirteen involving B.S.

Fourth trial counsel testified that the strongest issue on direct appeal for count one was that the statute of limitations had expired for the convicted offense of attempted aggravated rape. The issue was one of first impression in Tennessee, and fourth trial counsel argued the issue all the way to the Tennessee Supreme Court. The Petitioner initially had been represented by first and second trial counsel, who were public defenders. In the trial for counts eleven through thirteen involving B.S., first trial counsel had filed a motion to suppress evidence seized from the Petitioner's person, home, and vehicles pursuant to the search warrant. Fourth trial counsel raised the suppression issue on direct appeal of those convictions. Fourth trial counsel said he did not raise an issue on appeal regarding the attachment of the GPS device because he did not find that any evidence was obtained from the device.

On cross-examination, fourth trial counsel testified that third trial counsel was responsible for most of the trial work while fourth trial counsel was responsible for filing motions and for cross-examining the State's DNA witnesses. He said that on direct appeal of the Petitioner's convictions in counts eleven through thirteen involving B.S., this court held that the information in the search warrant affidavit was sufficient to establish probable cause.

Appellate counsel testified that he represented the Petitioner on direct appeal of the Petitioner's convictions in counts six and seven involving D.A. and J.G. Appellate counsel was aware of the United States Supreme Court's 2012 ruling in *Jones* but did not think the decision had any bearing on the Petitioner's appeal. Appellate counsel thought the

- 14 -

strongest issue on appeal was the trial court's sua sponte limitation of fourth trial counsel's cross-examination of the State's DNA expert. Upon reading the trial transcript, appellate counsel thought that fourth trial counsel clearly tried to make an offer of proof regarding the excluded testimony. However, fourth trial counsel "didn't use the magic words" by saying "I want to make an offer of proof," so this court ruled that the Petitioner was not entitled to relief. Appellate counsel did not appeal the trial court's denial of the first motion to suppress involving the search warrant. He thought the issue had been waived because he thought, albeit incorrectly, that it had not been raised in a previous appeal.

On cross-examination, appellate counsel testified that he was licensed to practice law in 1975 and that he retired a few years before the Petitioner's post-conviction evidentiary hearing. Ninety-five percent of his practice involved criminal law, and he handled forty to fifty appeals during his career. He noted that in cases he "inherited" on appeal, such as the Petitioner's direct appeal of counts six and seven involving D.A. and J.S., he could only raise issues that had been raised in the motion for new trial.

K.M.R. testified for the Petitioner that in June 2005, she was living in Nashville and reported an attempted sexual assault. Within a week of the incident, she went downtown, either to the MNPD or the TBI, to create a sketch of the suspect. She explained the process to create the sketch: She looked through a book of photographs, selected photographs with facial features like those of the suspect, and worked with law enforcement to create a composite sketch. In the sketch, the suspect she created was wearing a mask across his eyes like "The Lone Ranger." K.M.R. said that although her attacker's eyes were covered, she could see the area above and below the mask, which included his hair, part of his forehead, and below his nose. In 2019, a man named Ernest Rice showed up unannounced at K.M.R.'s home. K.M.R. was "very taken off-guard" by his arrival, but he was not aggressive, and she talked with him about her case. K.M.R. said she did not remember telling Mr. Rice that she did not create a sketch of the suspect. She stated, "I remember saying that I did do a sketch." Mr. Rice asked K.M.R. if she was shown a driver's license photograph of a suspect prior to creating the sketch, and she told him no.

On cross-examination, K.M.R. acknowledged that her attacker's DNA matched the Petitioner's DNA. The State charged the Petitioner with crimes connected to K.M.R., but K.M.R consented to the State's not prosecuting him.[8] K.M.R. said Mr. Rice told her that he was a retired policeman and that he was an investigator for the Petitioner's family. Mr. Rice took notes during his visit with K.M.R, but he did not show his notes to her.

---

[8] The Petitioner was charged with aggravated burglary and aggravated rape of K.M.R. in counts eight and nine, respectively, of the Davidson County indictment, but the charges were dismissed.

- 15 -

Ernest Rice testified for the Petitioner that he was a private investigator. The Petitioner's family hired him in 2019, and he went to K.M.R.'s home to interview her. Before the interview, he identified himself and told K.M.R. that he worked for the Petitioner's family. Mr. Rice said he asked K.M.R three questions. First, he asked if the attack in her home was a home invasion or if the suspect was already present when she arrived. K.M.R said the suspect was already there. Second, Mr. Rice asked if an assault occurred. K.M.R. told him that "she ran." Third, Mr. Rice asked if K.M.R. prepared a composite sketch of the suspect, and she said no. Mr. Rice said that K.M.R. denied ever preparing a sketch for the MNPD or the TBI and that he was "very surprised" by her answer. Their conversation was "very calm" and lasted fifteen to twenty minutes. Mr. Rice took notes during the interview and prepared a report.

The post-conviction court continued Mr. Rice's testimony to August 2023. Mr. Rice testified on cross-examination that he was a police officer in Montgomery County from 1974 to 1985. He interviewed K.M.R. on June 7, 2019, almost fourteen years after her attack, and he did not make an appointment for the interview. He denied introducing himself to her as a police officer. Mr. Rice said he never saw the police report in K.M.R.'s case or her sketch of the suspect. He said he received a telephone call from "a screaming attorney" the day after K.M.R.'s interview. The irate attorney claimed to represent K.M.R., but Mr. Rice suspected the attorney represented K.M.R.'s husband. Mr. Rice said that he did not interrogate K.M.R. and that she did not have to talk with him.

First trial counsel testified that he was licensed to practice law in 1998. He worked for the public defender's office and was assigned to represent the Petitioner. First trial counsel obtained a copy of the indictment and discovery. He remembered seeing a sketch of the suspect in the discovery materials, but he did not remember the sketch "being influential." First trial counsel said he filed motions to suppress in September and November 2008. The first motion challenged the probable cause for the May 1, 2008 search warrant, and the second motion challenged the validity of the April 28, 2008 stop. He said the trial court denied both motions. First trial counsel said he was in the process of investigating the GPS issue when the Petitioner retained private counsel. First trial counsel had prepared a draft motion for the GPS issue and gave the draft to third and fourth trial counsel.

On cross-examination, first trial counsel identified a copy of the draft motion related to the GPS device. When first trial counsel prepared the motion, he was not aware of the *Jones* case but had found cases in other jurisdictions that were helpful. On redirect-examination, first trial counsel testified that he did not have enough information to complete the draft motion; for example, he did not know when law enforcement placed the GPS device on the Petitioner's Jeep. First trial counsel said he gave everything in his possession regarding the case to third and fourth trial counsel.

- 16 -

The Petitioner testified on rebuttal that trial and appellate counsel should have filed a motion to suppress based on the unlawful attachment of the GPS device to his Jeep because the buccal swabs used to match his DNA to the crimes were obtained after the installation of the GPS device and, therefore, were "fruit [of] the poisonous tree." He also said the May 1, 2008 search warrant was illegal and void because, under the totality of the circumstances, there was not a fair probability that evidence of the crimes would be found in a particular place, such as his home.

On February 8, 2024, the post-conviction court entered an order denying the petitions for post-conviction relief. The court made extensive findings and concluded that the Petitioner failed to show deficient performance by trial or appellate counsel and failed to show prejudice.

## ANALYSIS

### I. Ineffective Assistance of Counsel

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citations omitted). However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *Id*. (citing *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013)). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *Id*. at 400 (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is

applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## A. GPS Tracking Device

First, the Petitioner claims that trial and appellate counsel were ineffective as to all counts because they failed to challenge the warrantless installment of the GPS device on his Jeep, which the police used to track his movements, and failed to seek suppression of his buccal swabs as fruit of the poisonous tree from the warrantless GPS search. The Petitioner contends that his DNA on the buccal swabs was fruit of the poisonous tree because law enforcement used the GPS device to locate and arrest him on May 1, 2008. The State argues that the Petitioner is not entitled to relief. We agree with the State.

In support of his argument, the Petitioner relies on *United States v. Jones*, 565 U.S. 400, 404 (2012), which held that law enforcement's placement of a GPS tracking device on a suspect's vehicle constitutes a "search" within the meaning of the Fourth Amendment and, therefore, requires a warrant. Generally, placing a GPS device on a vehicle and monitoring the vehicle's movements without a warrant renders the search unconstitutional. *State v. Phifer*, No. M2013-01401-CCA-R3-CD, 2014 WL 4698499, at *13-16 (Tenn. Crim. App. Sept. 23, 2014), *no perm. app. filed*.

Addressing this issue in its written order, the post-conviction court accredited fourth trial counsel's testimony that he did not find that any evidence was obtained from GPS the device. The post-conviction court noted that fourth trial counsel's testimony was supported by Captain O'Neil, who testified at the Williamson County post-conviction hearing that no evidence was obtained from the tracker. *See also Burdick*, 2021 WL 2499313, at *2 (stating in the facts section of the opinion that "Captain O'Neil stated that they did not gain any information from the tracking device and were really just using it to protect the public until they could arrest the Petitioner, who was already a suspect). The post-conviction court concluded that because no evidence was obtained from the device, counsel were not deficient for not raising the issue.

The record does not preponderate against the post-conviction court's determination that counsel were not deficient. The Petitioner did not present any evidence that law enforcement obtained any information from the GPS device or that the police used the device to locate and arrest him on May 1, 2008. Captain O'Neil testified that the officers visually surveilled the Petitioner and that law enforcement installed the GPS device to protect the public in case officers lost sight of him. Fourth trial counsel, who was responsible for filing pretrial motions after replacing first and second trial counsel, did not find that any evidence was obtained from the device, and appellate counsel testified that he was aware of the *Jones* decision but that he did not think *Jones* had any bearing on the direct appeal he handled for the Petitioner.

As noted by the State, the Petitioner raised this same issue on direct appeal of the Williamson County Circuit Court's denial of his post-conviction petitions. *See id*. at *5. As this court explained in its opinion:

> The Petitioner's argument disregards the fact that no information or evidence was gathered as a result of the tracking device. The police had already obtained the Petitioner's DNA from utensils that he had used at a restaurant before the device was installed on his vehicle, and the DNA on those items matched the DNA collected of the unknown suspect in multiple rapes in Williamson and Davidson Counties. Evidence of the Petitioner's

- 19 -

DNA was not fruit of the poisonous tree as the police had already obtained the sample before attaching the device to his vehicle.

*Id*. at *6. We note that the May 1, 2008 search warrant authorized the collection of the Defendant's DNA. Therefore, we conclude that the record does not preponderate against the post-conviction court's determination that the Petitioner failed to establish that trial counsel and appellate counsel were deficient or that the Petitioner was prejudiced by any deficiency.

## B. Unlawful Arrest and Search Warrant

Also regarding all six counts, the Petitioner claims that trial counsel were ineffective for failing to file a motion to suppress evidence obtained from his unlawful arrest without probable cause on May 1, 2008, and failed to prepare an adequate motion to suppress evidence seized pursuant to the May 1, 2008 search warrant. The State argues that the Petitioner is not entitled to relief. We agree with the State.

In its written order denying relief, the post-conviction court found that both of these issues were addressed in the two pretrial motions to suppress filed by first trial counsel in the Petitioner's trial for counts eleven through thirteen involving B.S.; thus, the Petitioner failed to show that trial counsel were deficient. Later in its order, the post-conviction court addressed fourth trial counsel's failure to raise the issues on direct appeal of the Petitioner's conviction in count one involving P.Y. and appellate counsel's failure to raise the issues on direct appeal of the Petitioner's convictions in counts six and seven involving D.A. and J.G. The post-conviction court concluded that because the suppression issues were previously determined on direct appeal of the Petitioner's convictions in counts eleven through thirteen involving B.S., "it stands to reason" that fourth trial counsel and appellate counsel had no grounds to raise the issues on direct appeal again. Thus, the post-conviction court found that fourth trial counsel and appellate counsel were not deficient.

The Petitioner claims that the post-conviction court incorrectly found that the two motions to suppress addressed his alleged illegal arrest on May 1, 2008. We conclude that the record preponderates against the court's finding in this regard. The September 2008 motion alleged that Detective Elliott's search warrant affidavit failed to establish probable cause to issue the search warrant for the Petitioner's person, home, and vehicles, and the November 2008 motion alleged that the police officer illegally stopped and seized the Petitioner in the early morning hours of April 28, 2008. Neither motion sought to suppress evidence on the basis that the Petitioner's May 1, 2008 arrest was unlawful.

The Petitioner contends that trial counsel should have filed a motion to suppress based on an unlawful arrest because (1) his stop and arrest were made possible by the GPS

tracking device attached to his Jeep; (2) officers did not have probable cause to believe he was the Wooded Rapist on May 1, 2008, in that DNA evidence had not yet connected him to a Davidson County rape victim; and (3) the buccal swabs collected after his unlawful arrest were used against him at trial. Again, the Petitioner failed to present any proof that law enforcement used the GPS device to track his vehicle or that information was obtained from the device that resulted in his arrest on May 1, 2008. He also failed to present any proof that law enforcement lacked probable cause for his arrest. As we noted previously, the May 1, 2008 search warrant authorized the collection of the Petitioner's buccal swabs. Thus, we conclude that the record does not preponderate against the post-conviction court's determination that the Petitioner has failed to show that counsel was deficient for failing to challenge his arrest as unlawful or that he was prejudiced by any deficiency.

As to the Petitioner's second argument, that trial counsel failed to prepare an adequate motion to suppress evidence seized pursuant to the May 1, 2008 search warrant, he contends that the September 2008 motion to suppress failed to articulate "critical differences" between the suspicious man described in Detective Elliott's search warrant affidavit and the Wooded Rapist. For example, the Petitioner was looking into cars with a flashlight on April 28, 2008, whereas the Wooded Rapist was known to look into potential victims' homes; therefore, trial counsel should have argued that the Petitioner's actions created probable cause to believe he was preparing to engage in auto burglary, not rape.

We conclude that the record does not preponderate against the post-conviction court's conclusion that the Petitioner failed to show ineffective assistance of counsel. First trial counsel contended in the September 2008 motion to suppress that the search warrant affidavit failed to establish probable cause. In the motion, first trial counsel asserted that the suspicious man seen on April 28, 2008, was in the Meadowlake neighborhood, not Forest Hills where many of the rapes occurred; that the previous rape in the Meadowlake area occurred four years earlier in 2004; that the clothing worn by the suspicious man on April 28, 2008, was not exactly like the clothing worn by the man who committed the rape in 2004; and that the Petitioner did not match the description of the suspicious man reported to 911 or the suspected Wooded Rapist when the officer stopped the Petitioner on April 28, 2008. The trial court held a hearing and denied the motion.

On direct appeal of the Petitioner's convictions in counts eleven through thirteen involving B.S., this court considered whether the affidavit established probable cause and stated as follows:

> The [trial court's] written order denying the first motion to suppress contains detailed findings of fact. The court noted the proximity of the attacks and the similar descriptions of the perpetrator. It found that the "[m]ost important" fact was that on April 28, 2008, the [Petitioner's] still-warm car

was parked a short distance from the address where a few minutes earlier, a witness saw a suspicious person. The court also noted that the [Petitioner's] report of his whereabouts that night was contradicted by the resident whose home the [Petitioner] said he had been visiting. The court found that the [Petitioner's] clothing appeared to be dry, as if he had just changed, although "it was evidently raining on April 28, [2008]." The court noted the similarities of the clothing worn by the suspicious person seen that night, the "Wooded Rapist," and the perpetrator of the November 2004 rape on the same block. The court found that despite the gap of almost four years between the November 2004 rape and the April 2008 suspicious person sighting, the attacks had occurred sporadically over a fourteen-year period. . . . . Considering these facts, the trial court found that the magistrate had probable cause to issue the search warrant. Upon review, we conclude that the affidavit provided sufficient facts to support a finding of probable cause[.]

*Burdick*, 2012 WL 1366359, at *8. Given this court's conclusion that the affidavit established probable cause for the search warrant, we conclude that the record does not preponderate against the post-conviction court's determination that trial and appellate counsel were not deficient for failing to raise the issue in the Petitioner's other trials and direct appeals in connection with the remaining individual counts. The Petitioner is not entitled to relief on this issue.

### C. Failure to Investigate Contents of Search Warrant

Next, the Petitioner claims that trial counsel were ineffective as to all six counts for failing to investigate statements in the May 1, 2008 search warrant affidavit. He asserts that, had trial counsel done so, they would have discovered that Detective Elliott "deliberately and falsely" stated that K.M.R. met with representatives of the TBI, that K.M.R. created a sketch of the suspected Wooded Rapist, and that the sketch closely resembled the Petitioner's driver's license photograph. The Petitioner asserts that he was prejudiced by trial counsel's deficient performance because Detective Elliott's latter claim about the sketch closely resembling the Petitioner's photograph "was used in large part" to establish probable cause for the search warrant. We conclude that the Petitioner is not entitled to relief.

In support of his claim, the Petitioner relies on Mr. Rice's testimony that K.M.R. told him that she ran from her attacker and that she did not prepare a composite sketch. The Petitioner posits that by running away, K.M.R. was unable to identify her attacker with any degree of certainty and could not have assisted law enforcement with the sketch. However, Mr. Rice's testimony directly contradicted K.M.R.'s testimony that she told Mr.

- 22 -

Rice that she did prepare a sketch. On cross-examination, the State showed K.M.R. a composite sketch, and she identified it as the sketch she prepared on June 30, 2005. The post-conviction court did not address this issue in its written order denying relief and, therefore, did not accredit the testimony of one witness over the other. We note that first trial counsel testified that he remembered seeing a sketch in the Petitioner's discovery materials.

In any event, the trial court's finding that the search warrant affidavit established probable cause was based on much more than Detective Elliott's statements about the sketch. The affidavit spans more than eight pages, and the "STATEMENT OF FACTS IN SUPPORT OF PROBABLE CAUSE" section of the affidavit spans five of the eight pages. The facts in the affidavit were summarized by this court on direct appeal of the Petitioner's convictions for counts eleven through thirteen involving B.S., and we quoted the summary previously in this opinion. *See Burdick*, 2012 WL 1366359, at *7. In denying the Petitioner's first motion to suppress, the trial court stated in its written order,

> Most important of all the facts is that the [Petitioner's] vehicle, which was still warm, was seen parked by itself a very short distance from [the residence on] Williamsburg Road only minutes after the suspicious man was seen. Also, the fact that the [Petitioner's] story of where he had been that night could not be substantiated upon further investigation strengthened suspicions that he was the man seen by [the witness] that night.

> Detective Elliott of the [MNPD] swore out the affidavit under examination. He attested to the fact that the [Petitioner's] driver license photograph matched the sketch of the "Wooded Rapist" which was produced by the [TBI]. The [Petitioner] argues that any sketches and photos of the suspect and the [Petitioner] should have been affixed to the affidavit for the magistrate to determine whether any such resemblance existed.

> However, the magistrate was entitled to presume Detective [Elliott's] reliability in swearing out the affidavit since he was an investigating officer in the matter. *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). Therefore, it would have been unnecessary to include the [Petitioner's] photograph and sketch for comparison by the magistrate to determine whether probable cause existed to issue the search warrant.

> Taking into account the information relayed to Brentwood Police in the initial investigation, in conjunction with the proximity of the [Petitioner] in the area at that particular time, it appears as though the investigating officers had ample suspicion to believe that the defendant was the individual

seen at the residence on Williamsburg Road. These facts, along with the similarities between the suspect's description, location, time and manner of activity, lend support to the contention that this person may be the "Wooded Rapist."

Based on a thorough examination of all the circumstances surrounding events and accounts as set forth in the affidavit, the Court is of the opinion that the magistrate was provided with probable cause sufficient to issue a search warrant.

Therefore, we conclude that the Petitioner has failed to demonstrate that trial counsel was deficient for failing to investigate Detective Elliott's statements about the sketch or that he was prejudiced by any deficiency.

### D. Promise in Opening Statement

The Petitioner claims that third trial counsel was ineffective by failing to keep a promise he made to the jury during opening statements in the Petitioner's trial for counts eleven though thirteen involving B.S. Specifically, the Petitioner claims that third trial counsel promised that a DNA expert would testify for the defense. The Petitioner contends that he was prejudiced by the deficiency because the broken promise caused the defense to lose credibility with the jury, noting that the prosecutor even commented about the broken promise during the State's closing argument.

In addressing this ground of ineffective assistance of counsel in its written order, the post-conviction court first reviewed and quoted relevant portions of third trial counsel's opening statement. Third trial counsel told the jury as follows:

They don't have anything from inside the house that ties them to [the Petitioner]. They don't have anything they retrieved from the yard that ties them to [the Petitioner]. They have nothing but DNA evidence.

DNA evidence -- we're not here today -- we're not going to debunk the entire field of DNA evidence. It's a science. It's the best science criminally we probably have right now.

But it still is dependent on the experiment being conducted up to the scientific method. It still matters how it was applied.

Now, it's probably going to be as dry as yesterday's hay when they put the TBI guy up there, and the big boy with the ponytail stands up to

- 24 -

challenge the application of the science, but I encourage you to listen, please, because it's going to be important. Because at the end of the day what you're going to find out -- *probably even from their own expert; if not, then, certainly from ours* -- is that this experiment was conducted well beneath the scientific method for conducting these type of [experiments].

It's all they've got. I mean, they've got to hit with that or they can't hit. We submit to you that from a defense standpoint, the scientific evidence and the version of the events the victim gives you, that's not going to match. The science can't be infallible because if the science is correct then the victim is mistaken. You just can't have it both ways.

So don't make up your mind until we get an opportunity to cross examine the government's proof. And remember we're presumed innocent until they've proven us guilty beyond a reasonable doubt. And allow us to enjoy the presumption that the [constitution] entitles us.

(Emphasis added.)

During the State's closing argument, the prosecutor said:

I tried on Monday when I gave my opening statement [not] to promise things that we couldn't deliver (sic). I hope I've not done that. If so, it was error on my part, but I don't think I did. I don't think I told you anything that you didn't hear and wasn't proven up by the facts in this case.

I'm going to mention one thing, and one thing only. You heard [third trial counsel's] opening statement. I may stand corrected but I did believe it was something about [a] defense expert. I didn't say anything about that, but you did in a way hear from that defense DNA expert. Remember Agent Johnson, I [asked him], did you get a chance to get a copy of the defense DNA expert's report.

Yes.

And reviewed it.

Anything on that report call into question your findings?

No.

- 25 -

But no use calling an expert that's going to agree with the State's [expert], I suppose.

Third trial counsel responded to the prosecutor as follows in his closing argument:

I beg to differ with [the prosecutor]. I don't recall making any promises that we were going to call any proof. What I do recall telling you is that a scientific experiment is only as good as the way in which it is conducted. I told you that there's a scientific method to be employed in a scientific experiment. And I told you that proof of contamination could likely impact the outcome of any scientific experiment.

You may not have realized it, but you heard it during the trial. And you heard it come from the government's expert, [Agent] Johnson. And I'm going to show you where. I'm not going to debunk the field of DNA science for you. That's not the [Petitioner's] role today. I can't do it. DNA science is what it is. But every scientific experiment has to have a constant. [Agent] Johnson told us that.

In its written order, the post-conviction court found that third trial counsel did not promise that a DNA expert was going to testify for the defense but that the jury would hear from either the State's DNA expert or the defense's DNA expert about the standards for DNA analysis. The court concluded, "In considering the entirety of [third trial counsel's] opening statement and closing argument, this Court finds that [third trial counsel] made strategic decisions as to what he told the jury regarding the manner in which they would hear testimony about the standards for DNA testing." The post-conviction court found that third trial counsel was not deficient.

In support of his argument that he received the ineffective assistance of counsel, the Petitioner cites *State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Crim. App. 1991), in which the defendant was charged and convicted of second degree murder for killing her husband. At trial, defense counsel announced in his opening statement that the defendant would testify and that a psychologist would testify favorably for the defendant regarding her defense of "battered wife syndrome." *Zimmerman*, 823 S.W.2d at 221-22. At the conclusion of the State's proof, though, defense counsel recommended to the defendant that she not testify. *Id*. at 222. Defense counsel also rested without presenting the expert's testimony or any other proof. *Id*. This court concluded that defense counsel was ineffective, stating that "nothing changed during the course of the trial. . . . In other words, there appears to have been no basis for the sudden change in strategy." *Id*. at 226.

- 26 -

Unlike *Zimmerman*, the record supports the post-conviction court's finding that third trial counsel did not promise the jury that a DNA expert was going to testify for the defense. Third trial counsel said in his opening statement that the jurors were going to hear from either the State's expert or the defense's expert that the DNA analysis in this case "was conducted well beneath the scientific method for conducting these type of experiments." During third trial counsel's closing argument, he asserted that testimony by the State's own expert, Agent Johnson, showed that the State's DNA analysis was subpar. Therefore, the record does not preponderate against the post-conviction court's determination that third trial counsel did not provide deficient performance.

### E. Closing Arguments

The Petitioner claims that third trial counsel was ineffective for failing to object to "flagrant remarks" made by the prosecutors during the State's closing argument in the trial for counts eleven through thirteen involving B.S. and that fourth trial counsel was ineffective for failing to raise the issue on direct appeal of the convictions. The State argues that the post-conviction court properly held that third trial counsel made a strategic decision not to object to the prosecutors' comments. We agree with the State.

The Petitioner takes issue with the following statements made by one of the prosecutors during the State's first closing argument:

> I would like to start with perhaps an observation, saying, that I've heard something that fits this case, which is that the face of evil is quite ordinary.
>
> . . . .
>
> But remember what Nurse Stopplebein wrote down, if not verbatim, word for word, but [B.S.] expressed concern that this not happen to someone else.
>
> . . . .
>
> But could you imagine -- let's say you had ten witnesses. [A male suspect] is on trial. He's indicted for this. . . . And Agent Johnson takes the stand and says, [the suspect] is excluded from being the perpetrator of this crime. Would any jury convict him? No.

He also takes issue with the following statements made by the second prosecutor during the State's rebuttal closing argument:

I'll say [the Petitioner] is guilty. He's guilty of all of the charges that he has before him today.

. . . .

But, ladies and gentlemen, what you have before you is DNA, something 20 years ago we would not be here, obviously, on this case. But we're here now.

[The Petitioner back] then would have committed . . . the perfect crime.

. . . .

DNA evidence is infallible. People doing the DNA evidence can be infallible.

. . . .

He penetrated her sexually in the anal area and also vaginally, and that's aggravated rape.

The Petitioner contends that the prosecutors referred to him as "evil"; used Nurse Stopplebein's testimony to direct the jury to convict him in order to protect the community; told the jury that any penetration constituted aggravated rape, deliberately omitting the essential element of bodily injury; vouched for the DNA evidence by stating that no jury would convict a suspect if the DNA evidence excluded the suspect and by describing DNA evidence as "infallible"; and offered the prosecutor's opinion by telling the jury that the Petitioner almost committed "the perfect crime" and by saying that the Petitioner was guilty of all the charges. In denying relief on this ground, the post-conviction court accredited third trial counsel's testimony that he did not recall the prosecutor's misstating the law and that it was his usual practice not to object during closing arguments in order to avoid harming the Petitioner's case. The post-conviction court concluded that third trial counsel was not deficient.

"The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." *Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010), *perm. app. denied* (Tenn. May 11, 2010). Trial counsel can decide not to object for several valid reasons, including not wanting to emphasize the unfavorable statements. *Id*. (citing *Lance v. State*,

- 28 -

No. M2005-01765-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App. Aug. 16, 2006), *perm. app. denied* (Tenn. Dec. 18, 2006)).

Third trial counsel testified that he typically did not object during opposing counsel's closing argument but that he would have done so and requested a sidebar if the argument had been exceedingly objectionable. He also testified that the fact that he did not object meant that he did not think the prosecutor's comment was so egregious as to warrant "jumping up" and "getting shot down" in front of the jury. Thus, the record supports the post-conviction court's determination that third trial counsel made a strategic decision not to object and that counsel did not provide deficient performance.

### F. Hearsay, Mistrial, and Sentencing

The Petitioner contends that third counsel was ineffective during the trial involving count six, especially aggravated kidnapping of D.A., and count seven, aggravated rape of J.G., because (1) third trial counsel did not object to hearsay when Ms. Myers, the nurse practitioner who examined J.G. and collected evidence for a rape kit, testified that J.G. made the statement, "Mom said he had [a] gun to her head," and (2) third trial counsel did not request a mistrial when Detective Lawson testified that the Petitioner was "'our serial rapist.'" The Petitioner also contends that trial counsel were ineffective at sentencing for failing to advocate for an eight-year sentence for his conviction of attempted aggravated rape of P.Y. in count one and for failing to argue at his sentencing hearing for count six, especially aggravated kidnapping of D.A., and count seven, aggravated rape of J.G., that the trial court was statutorily required to consider his releasing D.A. alive as a mitigating factor pursuant to Tennessee Code Annotated section 39-13-305(b)(2). The State argues that the Petitioner is not entitled to relief. We agree with the State.

Although the Petitioner testified about these issues at the post-conviction hearing, he did not question trial counsel about them. The only issue the post-conviction court addressed in its written order denying relief was third trial counsel's failure to object to Ms. Myers's testimony as hearsay. The post-conviction court concluded that Ms. Myers's testimony about J.G.'s statement was admissible under Tennessee Rule of Evidence 803(3), the hearsay exception to show J.G.'s "then existing state of mind, emotion, sensation, or physical condition."

"[T]he burden of proof on an ineffective assistance of counsel claim lies with the proponent, in this case the [Petitioner]." *State v. Frye*, No. E2019-00686-CCA-R3-CD, 2021 WL 1971982, at *19 (Tenn. Crim. App. May 17, 2021). This court will not speculate as to counsel's testimony. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). By not questioning counsel about their actions or inactions regarding the issues, the

Petitioner did not present any evidence to show deficient performance. Accordingly, he cannot establish ineffective assistance of counsel.

## II. Cumulative Error

The Petitioner contends that the cumulative effect of trial counsel's deficiencies created sufficient prejudice to warrant new trials or sentencing hearings. The cumulative error doctrine requires relief when "multiple errors [are] committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted). Having found no error, we conclude that the Petitioner is not entitled to relief on the basis of cumulative error.

## III. Constitutional Claim

Finally, the Petitioner raises a free-standing constitutional claim with respect to the Tennessee statute that allows consecutive sentencing for a "dangerous offender." Specifically, he contends that the statute is void for vagueness pursuant to *Johnson v. United States*, 576 U.S. 591 (2015). The State argues that the Petitioner has waived this issue because he failed to raise it on direct appeal of his convictions.

A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann. § 40-30-106(g)(1), (2). The Petitioner has not argued that either exception applies in this case. Thus, we agree with the State that the issue is waived.

## CONCLUSION

Upon review, we affirm the judgment of the post-conviction court.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE